**Willie AIKENS et al., Plaintiffs,**

**v.**

**I. W. ABEL, Individually and as International President of United Steelworkers of America, AFL–CIO, et al., Defendants.**

**John S. BARBERO et al., Plaintiffs,**

**v.**

**I. W. ABEL, Individually and as International President of United Steelworkers of America, AFL–CIO, et al., Defendants.**

**Civ. A. Nos. 74–17, 74–22.**

United States District Court,
W. D. Pennsylvania.
March 26, 1974.

James H. Logan, Pittsburgh, Pa., David Scribner, New York City, Rutgers University School of Law, Arthur Kinoy, Newark, N. J., Michael E. Tigar, San Francisco, Cal., for plaintiffs.

James D. English, William H. Schmelling, Pittsburgh, Pa., United Steelworkers of America, Michael H. Gottesman, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., Leonard J. Scheinholtz, Arthur J. Schwab, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

In March of 1973, the defendant United Steelworkers of America (USWA) entered into an agreement with the ten defendant steel producing companies entitled the Experimental Negotiating Agreement (hereinafter ENA). In the terminology of contract law, the USWA, in return for certain enumerated benefits, gave up the right to strike and agreed to submit all issues unresolved in the bargaining process to final and binding arbitration by an impartial arbitration panel. In this consolidated

action,[1] plaintiffs challenge the legality of the internal union process used in ariving at such an agreement. By implication perhaps plaintiffs' suit can also be said to attack the fundamental premise of the ENA itself—the right and ability of a union to give up the right to strike. It is clear that plaintiffs' goal is to enjoin the setting in motion of the negotiating and arbitration mechanisms of the ENA until the agreement has been subjected to a referendum of the USWA's rank and file membership employed in the basic steel industry.

The ENA represents the culmination of several years of investigation and discussion on the part of both the steel companies and the USWA toward finding a new approach to conducting collective bargaining.[2] The last nationwide steel strike in this country took place in 1959. The strike lasted for 116 days until the "national emergency" it had created was enjoined under the Taft-Hartley Act. United States v. USWA, 271 F.2d 676 (3d Cir. 1959), aff'd; 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12. Since then, the USWA and the steel companies have reached agreements on national contracts four times without the need for a strike. Nevertheless, the effects of the 1959 strike have been felt right up until the present day for that strike marked the beginning of the era of the boom-bust cycle, a pattern of triennial dislocation whose far-reaching effects have been felt by everyone involved in steel production and by the nation itself.

In the years since 1959, the customers of the steel industry have engaged in a cyclical pattern of stockpiling and hedge-buying. Usually within a year of the time that a national steel agreement is set to expire and negotiations toward a new agreement are set to begin, customers of the steel industry have begun stockpiling steel inventories, that is, increasing their purchases of steel in order to insure themselves of a sufficient supply on hand should a strike occur. In addition, steel customers have increasingly been forced to turn to foreign producers for their supplies and have often been induced to make long-term commitments to buy from those foreign companies.

This cyclical pattern of stockpiling and hedgebuying has had dramatic and severe effects upon the steel industry. The successful completion of steel industry negotiations has invariably resulted in an enormous drop in orders for steel, and consequently in an enormous drop in domestic steel production. The domestic steel companies, who paid overtime wages to meet production demands during the boom period, suffered decreased profits and losses as a result of the decrease in sales during the slack period. In the long run, the steel companies' sales have also decreased because the footholds gained by foreign producers in past years have become permanent inroads into the American market. All of this, of course, has an adverse effect upon the nation's economy and the nation's balance of payments. But when domestic steel production drops, the immediate and hardest-hit victims are the employees of the steel companies, members of the USWA. These employees bear the brunt of the layoffs, demotions and reduced work weeks which are the inevitable result of decreased production.

Not surprisingly, in light of the mutual detriment suffered by all parties as a result of the boom-bust cycle, all sides have searched for a new approach to collective bargaining which would have less disruptive consequences. In 1967 the major steel companies first proposed the idea of substituting binding arbitra-

1. The actions at No. 74–17 and No. 74–22 were consolidated by Order of Court prior to trial. Also, each of the parties formally consented on the record to plaintiffs' request to consolidate their petitions for preliminary and permanent injunctive relief. In addition, it should be noted that the class action allegations contained in the original complaints were voluntarily withdrawn by plaintiffs.

2. In accordance with Rule 52(a) of the F.R. Civ.P., this Opinion shall constitute the Court's findings of fact and conclusions of law in this case.

tion for the right to strike to the USWA. In that year, the union's 28-member International Executive Board (IEB) made up of the USWA's three top officers, the National Director of Canada and the 24 District Directors, rejected the proposal. According to the testimony of I. W. Abel, president of the USWA, and Bernard Kleiman, the union's general counsel, the decision not to accept the proposal in 1967 was motivated by three considerations:

(1) NOVELTY: At the time the union had little or no experience with binding arbitration and no means of gauging its effect upon their goals and policies.

(2) SAFEGUARDS: The 1967 proposal contained no assurance that certain hard-won contract provisions, "sacred cows" in Mr. Kleiman's words, would not be subject to arbitration and thus subject to elimination in a neutral forum.

(3) BENEFITS: The 1967 proposal contained no provision for a special payment to employees symbolic of their share of the economic benefits which would accrue to the companies with the elimination of the boom-bust cycle.

It was at this point, upon rejection of the proposal, that the IEB issued on December 2, 1967 "an extensive clarification" of its position. The IEB Report was published in Steel Labor, the official journal of the USWA, a copy of which is sent to each union member's home. This statement, sent out under the imprimatur of the entire IEB, but drafted, as he testified, by Bernard Kleiman, was the subject of some controversy at the hearing in this case. That portion of the statement which was in dispute reads as follows:

"When this conditional proposal was brought before the International Executive Board, it was again stressed that *no agreement of this type could possibly be reached, under any circumstances, without* prior approval from all policy making bodies within our union, including the International Wage Policy Committee, the newly established Basic Steel Industry Conference of the local unions and *a poll of the membership directly involved.*" (Emphasis added.)

This statement is of some symbolic importance, for plaintiffs contend that because defendants broke this "promise", a referendum must be conducted on the ENA. Defendant union's contention is that the statement is no more than an unenforceable statement of intention occasioned by the fact that the Steel Industry Conference (SIC), the ratifying body referred to in the quotation, was not yet operative or even in existence.

With the rejection of the proposal by the IEB in 1967, the USWA and the companies began negotiations toward a 1968 contract under the usual procedures. But as the strike deadline for those negotiations neared, unable to resolve the issue of which employee categories were to be covered by incentive wage provisions, the parties agreed to submit that question to binding arbitration in order to avert a nationwide strike. That submission of the issue of incentive coverage to binding arbitration in 1968 was significant in two respects. First, it provided an opportunity for both the companies and the union to gain experience in dealing with binding arbitration. As such, it was an important factor leading to the eventual adoption of the ENA.

The second significant aspect of the 1968 submission of the issue of incentive coverage to arbitration was the manner in which it was accomplished. The union officials who had been conducting contract negotiations with representatives of basic steel, first approved such a plan themselves and then submitted their agreement to the SIC for ratification. The SIC, alluded to in the 1967 Steel Labor letter above, is an organization created in 1966 by Resolution 24 of the union's International Convention with the "authority to reject or ratify contracts". Its membership is made up of

some six hundred local union presidents from plants in the basic steel industry who are, of course, like the USWA's top officials and the members of the IEB, elected by the USWA rank and file.

The avowed reason for creating industry conferences in the basic steel, aluminum, can and nonferrous metal industries was to replace what had formerly been the function of the less representative Wage Policy Committee and, in the words of Resolution 24, to give the membership a more "meaningful role in deciding their own destiny". Toward that end, the 1968 agreement to submit the issue of incentive coverage to arbitration was put before the SIC, which approved the proposal in its representative capacity. The 1968 arbitration was never submitted to a ratification referendum of the USWA membership employed by the ten basic steel companies.[3]

This then is the background leading up to the adoption of the ENA. In mid-1972, the steel company representatives again approached the officers and counsel of the USWA with the proposal that binding arbitration of all unresolved issues be substituted for the accept-our-position-or-accept-a-strike stance which had characterized previous steel industry negotiations. Discussions of the companies' proposal were carried on within what is called the Top Committee, four company officials authorized to speak for the ten largest steel companies in the United States, the ten companies named as defendants here, and five representatives of the USWA. During the preliminary discussions of what was to become the ENA, the steel company team was chaired by R. Heath Larry, vice chairman of the board of the United States Steel Corporation. The union side was headed by I. W. Abel and made up of the International vice presi-

dent and secretary-treasurer, plus its general counsel and special counsel.

As had been customary since the inception of high level bargaining between representatives of the steel companies and the USWA in 1942, the subject matter of their deliberations, and indeed the fact that such deliberations were taking place, was not disclosed to the public.

By mid-March of 1973, the parties had reached an agreement in principle on the substance and detail of the ENA. On March 14, a meeting of the SIC was scheduled for March 28 and 29 in Pittsburgh, Pennsylvania. The local union presidents who were to attend were each sent a letter which informed them when and where the meeting would be held, but said nothing as to its proposed subject matter. On March 27, the IEB, the highest governing body within the union between conventions, approved a tentative draft[4] of the ENA. On March 29, after two days of debate, the SIC approved that draft of the agreement. Of the several hundred local union officers present at the SIC convention, seven voted against ratification. Prior to that ratification vote, a motion from the floor that the vote be postponed until the officers could consult with their membership was defeated.

Shortly thereafter, the Top Committee agreed upon a final draft of the language of the ENA. On April 16, 1973, the USWA sent to each of its members, employed in the basic steel industry, a letter which described the agreement and set out the thinking behind its adoption. On April 23, 1973, the ENA was formally signed by the parties.

Essentially, the ENA provides that there will be no nationwide steel strike or lockout on or after August 1, 1974 when the 1971 agreement expires. Instead, if the parties are unable to re-

---

3. Approximately 350,000 of the USWA's total membership of 1.4 million persons are employed by the ten companies which are defendants in this action.

4. The tentative draft was the same as the final draft except for the deletion of a clause

permitting the companies to lock out in the former. There is no evidence to support a finding that such deletion was arbitrary, discriminatory or in bad faith. Its later insertion was only in accordance with the clear prior understanding of the parties.

solve all issues, unresolved national issues (the ENA permits local strikes over local issues authorized by the president of the USWA) will be submitted to an impartial panel of arbitrators chosen by both sides, whose decision will be final and binding.

The agreement's salient features include:

(1) A lump sum payment of $150.00 to each and every member of the USWA employed in basic steel, amounting to a cost of 50 million dollars to the steel companies.

(2) A guaranteed 3% floor for wage increases in each of the three years from 1974 to 1977.

(3) A guaranteed cost of living adjustment.

(4) Non-negotiability of four contractual items: (a) the union shop and checkoff provisions; (b) the no-strike and no-lockout clauses; (c) the management rights provision; (d) Section 2–B, under which the companies cannot change local working conditions absent significant technological advances.

Since the ENA is only applicable to the 1974 negotiations, it remains merely an experimental approach to steel industry collective bargaining. Either side is free to revert to the old approach if they find themselves dissatisfied with any aspect of ENA negotiation.

### PLAINTIFFS' CONTENTIONS

Negotiating teams from the USWA and the steel companies began negotiations under the ENA on January 30, 1974. Under the express terms of the agreement, the parties have until April 15, 1974, 20 days from today, to either resolve all issues or designate those issues which will be submitted to arbitration. The panel will render its decision by July 10, 1974, with a three-week clean-up period remaining until its decisions become final on July 31, 1974.

This suit was filed January 7, 1974. The hearing on plaintiffs' consolidated requests for preliminary and permanent injunctive relief took place March 4 through March 6, 1974. As can readily be seen, because negotiations under the ENA have already begun and because only a short time remains until it becomes known if arbitration will be necessary, prompt resolution of the matter before this Court is indicated.

Before embarking on a discussion of plaintiffs' claims, it is important to delineate the premises under which this Court proceeds. The question before me is *not* what would I have done if I were in charge of conducting industry-wide negotiations on behalf of the union. This Court will not review the decision-making process employed here and substitute its judgment for that of the parties. The wisdom of conducting negotiations in the manner in which they were conducted, and the wisdom of the ENA itself, are only matters of tangential concern here. No person sitting as a federal district court judge possesses, by virtue of his position, a monopoly on wisdom and reasonableness or a license to impose his public or private philosophy upon those who come before him. To proceed otherwise would be, in legal terminology, an abuse of discretion—in classical terminology, *hubris*.

Rather, this Court is called upon to make a two-fold determination: (1) Is there anything in federal law and/or in the governing rules of the USWA which commands, or even authorizes, this Court's interference with the process which the ENA compact has set in motion? (2) As a federal court exercising equity jurisdiction, what course of action may be discerned after an earnest and conscientious balancing of the equities, that is, what decision will best further the public interest?

Analyzing plaintiffs' claims from this point of view, it becomes obvious that plaintiffs' request for an injunction must be denied.[5] In order for

5. Because plaintiffs' request for relief is denied, it is unnecessary to reach the question

of the derivative liability of defendant steel companies other than to note that under

an injunction to be granted, this Court would have to find that, as plaintiffs allege, defendants' conduct was violative of federal law in that: (1) the defendant union officers breached the duty of fair representation which they owed to members of the USWA, or (2) the defendant union officers failed to conform their conduct to the high fiduciary principles of Section 501 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq. (LMRDA), popularly known as the Landrum-Griffin Act, or (3) the defendant union officers' action in adopting the ENA denied plaintiffs' rights granted them under Sections 101(a)(1) or 101(a)(2) of the LMRDA, or (4) the adoption of the ENA denied the plaintiffs' rights guaranteed them under the Constitution of the United States.[6]

## DUTY OF FAIR REPRESENTATION

In Vaca v. Sipes, 386 U.S. 171, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court defined the duty of fair representation as requiring the collective bargaining representative to:

> "serve the interests of all members without hostility or discrimination towards any, to exercise discretion with complete good faith and honesty and to avoid arbitrary conduct." Id. at 177, 87 S.Ct. at 910.

■ Plaintiffs contend that the defendant union officials violated the duty of fair representation to them and to the other members of the USWA by adopting the ENA without prior notice to the membership. But plaintiffs are unable to cite the Court to case law which even implies that a procedure of representative ratification instead of ratification by the entire membership is in any way improper or violative of the duty of fair

representation. Plaintiffs cite the Court to Steele v. Louisville & Nashville Ry. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Syres v. Oil Workers, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1965); and Nedd v. UMW, 400 F.2d 103 (3d Cir. 1968), in which it was held that a union owed the duty of fair representation to various factions or segments of its membership, namely non-union members (Steele), blacks (Syres) and retired members (Nedd). They argue that if the duty of fair representation is owed to various factions within a union, then a fortiori, it is owed to the entire membership. Indeed it may be, but it does not follow that a union may not fairly represent its entire membership by means of a process of representative participation rather than direct participation. Indeed, the propriety of such a process is implied in the very term fair representation. This Court holds that the failure of the union to submit a collective bargaining agreement to its membership for ratification does not violate the union's duty of fair representation.

■ Plaintiffs also contend that the failure of defendant union officials to inform delegates to the SIC, prior to their meeting on March 28 and 29, 1973, that the reason for that meeting was to discuss the ratification of the ENA was arbitrary conduct, violative of the third standard of the duty of fair representation. Given the "wide range of reasonableness . . . allowed a statutory bargaining representative" in the negotiation of labor agreements, Ford Motor Co. v. Huffman, 345 U.S. 330, 339, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) this Court expressly finds that such conduct was not arbitrary and was not violative of the union's duty of fair representa-

---

Rule 19 of the F.R.Civ.P., they were properly joined as persons needed for a just adjudication.

6. Plaintiffs also contend that this Court can exercise pendent jurisdiction over such of their claims as they make alternatively under state law. The Supreme Court has re-

peatedly made clear that the doctrine of preemption applies to labor relations and that federal law rather than state law is the standard applicable to measuring a parties' performance in collective bargaining. See, e. g., Humphrey v. Moore, 375 U.S. 335, 84 S. Ct. 363, 11 L.Ed.2d 370 (1964). Plaintiffs' claim of pendent jurisdiction will be denied.

tion. See also Bazarte v. UTU, 429 F.2d 868, 872 (3d Cir. 1970).

## SECTION 501 LMRDA

■ Unlike the duty of fair representation, the provisions of Section 501[7] of the LMRDA are intended to apply primarily to internal union affairs. That is to say, the Landrum-Griffin Act protects against dishonesty, fraud and conflicts of interest in union officials which prejudice the rights of their members, such as the misuse of union funds— Highway Truck Drivers v. Cohen, 334 F.2d 378 (3d Cir. 1964), or the failure to disclose that a union merger agreement results in higher salaries for union officials—Cefalo v. Moffett, 146 U.S. App.D.C. 117, 449 F.2d 1193 (1971). As such, Section 501 of the Act has little or no applicability to a union's performance of its collective bargaining function.[8] Even if a contrary view is adopted, that is if it were assumed that a cause of action is stated here under Section 501, this Court finds, upon consideration of the entire record, that no aspect of Section 501 was violated by defendant union officers' conduct in the matter here at hand.

## SECTION 101 LMRDA

■ Sections 101(a)(1) and 101(a)(2) of the Landrum-Griffin Act comprise a bill of rights applicable to the microcosmic union entity in the same way that the first ten amendments to the Constitution are applicable to society at large. Section 101(a)(1) incorporates the provisions of the fifth and fourteenth amendments to union activities. It provides:

> "Equal Rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws."

Section 101(a)(2) is analogous to the first amendment in guaranteeing the principles of free speech and assembly in union affairs. It provides:

> "Freedom of speech and assembly.— Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any

7. 29 U.S.C. § 501 provides:
"Fiduciary responsibility of officers of labor organizations . . . (a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interest of such organization, and to account to the organization for any profit received by him in

whatever capacity in connection with transactions conducted by him or under its direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

8. To the extent that it espouses a contrary point of view, Schonfeld v. Rohrback, 61 LRRM 2043 (S.D.N.Y.1965), is distinguished. In that case it was held that a cause of action was stated under Section 501 where plaintiff alleged that union officers had entered into a "sweetheart" contract with management. There is no further report of the case. In any event, this Court specifically finds that the ENA does not amount to anything even remotely similar to a sweetheart contract.

business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

Plaintiffs have not demonstrated that either section was violated by the activities complained of here.

It was held in Calhoon v. Harvey, 379 U.S. 134, 139, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) that Section 101(a)(1) forbids only unequal treatment *as between* members of a union. Since plaintiffs complain of a failure to ratify which affects all union members equally, for better or worse, there can be no violation of Section 101(a)(1) in this case.

Section 101(a)(2) was aimed at preventing "union officials from using their disciplinary powers to silence criticism and punish those who dare to question and complain". Salzhandler v. Caputo, 316 F.2d 445, 449 (2d Cir. 1963), cert. denied, 375 U.S. 946, 84 S. Ct. 344, 11 L.Ed.2d 275. Its broad terminology has never been used to require a union to prevent a union's representative officials from taking action well within their delegated powers and will not be here.

Finally, plaintiffs contend that defendants have denied them due process and freedom of speech and association and should be held liable under the Constitution of the United States. An identical claim was rejected by Judge Gourley of this Court in Litch v. USWA, 69 LRRM 2843 (W.D.Pa.1968), on the ground that without governmental participation in union activities, a cause of action cannot be stated against the USWA under the fifth or fourteenth amendments. I agree and hold that plaintiffs' final contention is without merit.

## BALANCING THE EQUITIES

There can be no question that

"in shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. . . . Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair and what is workable. . . . In equity as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities involved in reconciling competing interests . . ." Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151, 161–162 (1973) (Burger, C. J.)

The exercise of equity jurisdiction does not grant the Court *carte blanche* to impose its views upon the parties.[9] The District Court must look to the facts (here, for instance, to ascertain the existence of rules and regulations which govern relations between the parties) and the law, as discussed above, to ascertain whether clear guidelines exist for its action. Finding none, the Court is compelled to undertake the difficult task of balancing the equities, paying heed above all to the public interest which will be furthered or deterred by his ruling. The very foundation of a just society—the rule of law rather than the rule of men—requires that a federal judge disdain his personal inclinations and adhere to the course dictated by the greatest good for that society, paying due heed to the rights of each of its members.

9. The judge "is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system . . ." Cardozo, Nature Of The Judicial Process, 141 (1921).

■ This Court takes judicial notice of the fact that it is the nearly universal practice in modern labor relations for a union to waive the right to strike *during the term* of its collective bargaining agreements. This limited waiver right has been repeatedly recognized and upheld by the federal judiciary, most recently in NLRB v. Magnavox, —— U.S. ——, ——, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974) and Alexander v. Gardner Denver Co., —— U.S. ——, ——, 94 S.Ct. 1101, 39 L.Ed.2d 147 (1974). Those cases which approve the giving up of the right to strike during the term of a negotiated collective bargaining agreement, while not directly in point, are of some persuasiveness for they establish the principle that a union's right to strike is waivable under certain circumstances. Thus, they tend to support the conclusion that the right to strike was properly waived in this instance, so long as the proper internal union procedures were complied with.

Moreover, according to the testimony of William J. Usery, Director of the Federal Mediation and Conciliation Service, it is not an uncommon practice for a union to give up the right to strike and agree to binding arbitration of unresolved disputes *in advance* of the negotiation or execution of a collective bargaining agreement. It is clear, however, that the propriety of such an agreement has never before been challenged, or at least ruled upon directly, by a federal court. The task of making such a ruling is now before this Court.

■ It is also clearly established that it is legally permissible for a union to forego ratification of a collective bargaining agreement by its membership. William Usery stated in his testimony that while some industry unions require membership ratification, many require contract ratification only by a representative union body and many require no ratification at all. The legal effect of

such a discretionary union choice is clear. As stated in Confederated Independent Unions v. Rockwell-Standard, 465 F.2d 1137, 1140 (3d Cir. 1972):

> "The law does not require that a collective bargaining agreement be submitted to a local union or the union membership for authorization, negotiation or ratification, in the absence of an express requirement in the agreement, or in the constitution, by-laws or rules and regulations of the union."

Here it is clear that Resolution 24, a binding rule of the USWA passed by the 1966 Convention, provides that only the SIC, not the membership, has the authority to reject or ratify contracts.[10] The only matter which Resolution 24 requires be submitted to a vote of the entire membership is a decision to actually go out on strike. The status of the USWA as a union which under its governing rules and regulations has foregone the option of submitting collective bargaining agreements to the membership for ratification is undisputable.

■ Plaintiffs point to the letter in Steel Labor which advocated a poll of the membership on industry-wide agreements and to Resolution 23 of the 1972 Convention which reaffirmed the traditional importance of the strike weapon and commended those union members who had withstood privation in the course of strikes in the past. Resolution 23 reads in full as follows:

> "WHEREAS, it is this Union's policy to achieve, wherever possible, fair settlements at the bargaining table rather than on the picket line. We resort to strikes only when this is the only means by which our members may secure a just share of the profits which flow from their labor; and
>
> WHEREAS, experience has taught us, however, that we must always be prepared and willing to back our demands with the strike weapon and that we

---

10. Proposed resolutions which would have required membership ratification of collective bargaining agreements were introduced before the International Conventions in 1968, 1970 and 1972 but were not adopted.

must never shrink from the challenge posed by those employers who insist on a showdown by resisting our quest for equity; and

WHEREAS, much of what all of us enjoy today was made possible by the courage and perseverance of our members during the hardship and deprivation of strikes, many of which were long and bitter.

THEREFORE, BE IT RESOLVED that we commend our members who have been compelled to strike and who have thus demonstrated the strength and unity which has always been the hallmark of our Union. Further, we pledge to continue our support and render assistance to our members engaged in the battle for an honorable settlement."

Plaintiffs argue that the Steel Labor letter and Resolution 23 are evidence of the fact that the ENA waiver of the right to strike was in contravention of the union's internal rules. Such a finding would clearly be without support.

Resolution 23 is clearly exhortative and commendatory in nature; it confers no additional rights upon the USWA membership and does not speak to the waivability of the right to strike. The Steel Labor letter is of the same limited efficacy. As a statement of laudable intention by the union's top leadership, unconfirmed and undiscussed by anyone other than the four or five top men in the union, it clearly fails to rise to the status of a governing rule or regulation which is the standard of the *Rockwell-Standard* case. Only Resolution 24 meets this clear standard. The USWA was required by its internal rules only to submit the ENA to ratification by the SIC.

■ Plaintiffs also protest that without the SIC's truly informed consent that body's ratification of the ENA merely amounts to pro forma approval of a *fait accompli*. They have contended that the SIC ratification procedure was somehow violative of federal law. To be sure, the ENA may not have been af-forded the optimum widespread dissemination throughout the union membership which might be thought preferable under the circumstances. But, as discussed above, the manner and means of SIC ratification of the ENA was in no way violative of federal law, nor was it in contravention of the union's internal rules.

■ In essence, the plaintiffs have cited the Court to statutes embodying the principles of union democracy. Alleging that there was insufficient union democracy in the ratification process under examination here, they have urged that this Court rectify that shortcoming. The short answer to plaintiffs' contention is that the government of the USWA is not a pure democracy, but rather a republic, a representative democracy. As in any representative democracy, be it the USWA or the United States, actions taken by elected representatives are valid and legally irreproachable, even without the participation or informed consent of the representatives' constituencies, so long as the established governing procedures of the organization have been followed. This Court has expressly found that such procedures were followed in the situation under examination.

The thinking behind the policy choice I have made in this case was well expressed by Justice Oliver Wendell Holmes, writing for a unanimous Supreme Court:

"Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." Bi-Metallic Invest-

ment Co. v. State Board of Education, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed.2d 372 (1915).[11]

### CONCLUSION

As they state in their amended complaint, plaintiffs seek, as their ultimate relief, to have the ENA declared "void and inoperative". In so doing, they bring to light a fundamental philosophic inconsistency in their position. Insofar as they seek a membership referendum on the ENA, their motivation is professedly democractic and egalitarian. But insofar as they ultimately seek to have the ENA declared void and inoperative, their motivation would appear to be elitist. If the unspoken promise behind their thinking is that a union's legally recognized right to strike is so important, so hard-won, that no one, not even the union's representative leadership nor even, presumably, the membership themselves, can give it up, this Court disagrees. In any system of self-government, in theory and in practice, even the most precious of rights may be waived, always assuming that the system's established procedures for making such a decision are followed.

The emotion-laden term, right to strike, inevitably recalls the bloody and bitter historical struggle for parity that was waged by union members against the steel companies. No one, and especially no one with roots in the Pittsburgh area, belittles the importance of the right to strike; brave men died to win it. No one discounts their sacrifice. But it is symbolic of the changes wrought by time that this dispute is being resolved by means of civilized debate in a court of law, rather than by recourse to the violence and recrimination which characterized labor relations in the recent past. In keeping with the import of the problems at issue here, this

has been an exceptionally well-briefed, well-argued and well-conducted proceeding. From plaintiffs' point of view in particular, it should be seen as having accomplished the important function of serving as an open forum for the airing of complex and difficult public issues. In denying plaintiffs the relief they seek, this Court does no more than permit the ENA negotiating procedures to proceed as, at least potentially, an evolutionary step forward in labor relations.

---

11. This thinking also lay behind the promulgation of the LMRDA. As the Senate Report on the LMRDA explained:

"This is not to say that in order to have democratically responsive unions, it is necessary to have each union member make decisions on detail as in a New England town meeting. What is required is the opportunity to influence policy and leadership by free and periodic elections." (S. Rep.No.187, 86th Cong. First Sess. (1959), page 7).