CHATTANOOGA MAILERS UNION, LOCAL NO. 92, Plaintiff-Appellee,

v.

The CHATTANOOGA NEWS–FREE PRESS COMPANY, Defendant-Appellant.

No. 74–1437.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1974.

Decided Oct. 29, 1975.

Frank B. Wolfe, III, Kothe & Nichols, Inc., Tulsa, Okl., Alvin O'B. Moore, Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for defendant-appellant.

Walter L. Lusk, Chattanooga, Tenn., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and PECK and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal by the Chattanooga News-Free Press Company (the publisher) from a denial of its motion for summary judgment, from the granting of a motion for summary judgment in favor of the Chattanooga Mailers' Union, Local No. 92 (the union), and from an order that the publisher proceed to arbitration of a new or amended collective bargaining agreement and of grievances of union members concerning hiring practices in its mailing room. Jurisdiction is asserted under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). The primary issues on appeal are whether the collective bargaining agreement, scheduled to expire on August 21, 1971, remained in effect during negotiations after that date, and, if so, whether, consistent with national labor policy, a federal court should order arbitration of new contract terms if the provisions of a collective bargaining agreement so provide. We reverse and remand the case to the district court to determine whether the collective bargaining agreement expired on August 21, 1971. If the district court determines that the contract continued in force while the parties were negotiating modifications of the contract terms, the district court should reinstate its order requiring the parties to proceed to arbitration of new contract terms.

On August 22, 1969, a two year collective bargaining agreement signed by the publisher and the union became effective. The provisions of the agreement are as follows:

MAILERS' CONTRACT AND SCALE

Chattanooga, Tennessee

From August 22, 1969, through August 21, 1971

Section 1. It is hereby agreed by News-Free Press Printing Company, publisher of the Chattanooga News-Free Press, Party of the First Part, and the Subordinate Union of the International Mailers' Union, known as Chattanooga Mailers' Union No. 92, Party of the Second Part, that this contract and scale shall be in effect from August 22, 1969, through August 21, 1971.

Section 2. If either party wishes to propose an amendment or new contract, it shall notify the other party in writing not less than sixty (60) days prior to August 21, 1971, giving, in writing, a detailed statement of the changes desired. If neither party gives such notice, the contract shall continue in effect for one year, until August 21, 1972.

Section 3. The Party of the First Part agrees to employ in its mailing room members of the Chattanooga Mailers' Union No. 92. The Union agrees to furnish enough competent members to enable the Party of the First Part to issue its publications promptly and regularly. It is understood that present jurisdiction over work shall neither be extended nor relinquished during the term of this contract.

Section 4. The journeymen members of the Party of the Second Part shall receive $4.01⅓ per hour for night work and $3.82⅔ per hour for day work, effective August 22, 1969. The journeymen members of the Party of the Second Part shall receive $4.24 per hour for night work and $4.05⅓ per hour for day work, effective August 22, 1970. The journeymen members of the Party of the Second Part shall receive $4.34⅔ per hour for night work and $4.16 per hour for day work effective February 22, 1971. Overtime shall be paid at the rate of price and one-half of the hourly rate paid.

Section 5. In addition to the rates of pay provided for in this agreement, each man shall receive two ($2) dollars for working a double shift providing that this applies to straight time shifts only and does not apply if such doubling over results in overtime during a 5 shift week.

Section 6. The work week shall consist of five seven and one-half (7½) hour shifts.

Section 7. A lunch period of thirty (30) minutes shall be fixed by the foreman, with due regard to the mutual convenience of the office and the mailers, and such lunch period shall not be included as working time.

Section 8. Employees who have left the building and are called back for extra work beyond a regular shift shall receive $1.00 for the call, in addition to the overtime.

Section 9. The foreman's rate of pay shall be determined by mutual agreement between the foreman and the Publisher, provided that the wages paid the person holding the position of foreman shall not be less than the wage of the assistant foreman.

Section 10. The assistant foreman shall receive twelve dollars and fifty cents ($12.50) over the journeyman's scale for five (5) nights or five (5) days' work in accordance with Section Four (4).

Section 11. (a) Day work shall be between the hours of 7 A.M. and 6 P.M. and night work shall be between the hours of 6 P.M. and 7 A.M. For the shifts that do not begin and end with the hours specified for day work, not less than the night rate shall be paid.

(b) The foreman shall cause to be posted notice of changes in starting time at least 48 hours in advance. Notice shall not be required, however, when changes in starting time result from changes from Daylight time to Standard time and vice versa.

Section 12. The employer agrees that it is his intent to employ members of the Union in good standing as foremen in the mailing room, subject always to the provisions of existing laws. The foreman shall supervise and govern all employees of the mail room and shall hire and discharge. He may discharge for incompetency, neglect of duty or violation of reasonable office rules. He may decrease the force by discharging the person or persons last employed. In filling regular situations, the substitute oldest in service shall have prior right in filling the first vacancy.

Section 13. A Joint Standing Committee of four members shall be appointed: two members of said committee to be named by the Publisher, and two members by the Union. In case of a vacancy on said Joint Standing Committee from any cause, said vacancy shall be filled immediately by the appointment of a new member by the Party in whose representation on the Joint Standing Committee the vacancy occurs.

(a) To the Joint Standing Committee shall be referred for settlement all disputes arising out of the operation of this agreement, all disputes regarding the interpretation of any portion of this agreement, all disputes regarding discharged men and any and all disputes between the parties hereto arising out of their contractual relations.

The Joint Standing Committee must meet within ten (10) days from the date on which either party, hereto, through its authorized representative, notifies the other party, in writing, that a meeting is desired, and shall proceed forthwith to settle any question rightfully before it, such decision to be final and binding on both parties to this contract.

(b) If the Joint Standing Committee cannot reach unanimous agreement on any dispute, including disputes regarding discharged men within ten (10) days (this time may be extended by unanimous consent) from the date on which the dispuate is first considered by it, at the request of either party hereto, the members of the committee shall form a Board of Arbitration and shall select a fifth and disinterested party who shall act as Chairman of the Board of Arbitration. Said fifth member may be selected in any manner unanimously agreed upon by four members. If said four members fail to select a fifth member within twenty (20) days from the date on which either party requested the formation of the Arbitration Board, said fifth member shall be selected by the President of the International Mailers' Union and the Chairman of the Special Standing Committee of the American Newspaper Publishers' Association, or their proxies, upon the request of either party hereto. The Board of Arbitration thus formed shall proceed with all dispatch possible to settle the dispute. It shall require the affirmative votes of at least three of the five members of the Board of Arbitration to decide the issues, and the decision of the Local Board of Arbitration in all cases shall be final and binding on the parties hereto. The decision of the Board of Arbitration shall be signed by all members thereof, but is legal and binding when signed by a majority.

(c) If a discharged member is reinstated by the Joint Standing Committee, it has jurisdiction to determine if there shall be pay for lost time, and if so, the amount thereof. In case of discharge and subsequent reinstatement by action of the Joint Standing Committee, applicant for pay for lost time shall be required to show that he made diligent effort to secure other employment. Any amount earned from such other employment shall be deducted from any amount due for time lost.

(d) At the expiration of this contract, if notice of a desire to negotiate has been filed as provided in Section 1, thirty (30) days shall be allowed in which to negotiate a new contract, or amendment to this contract, and if an agreement is not reached in that time, the Joint Standing Committee shall then, as in any other dispute, act as an Arbitration Board. Pending and during arbitration, business in the mailing room of the Party of the First Part shall continue in accordance with all the terms of this contract until the date a new agreement is made. All decisions of a majority of the Arbitration Board shall be final and binding on both parties, except as provided in Section (e).

(e) In the negotiations of a new contract or a new wage scale, the Code of Procedure as is generally recognized and now in use in arbitration cases between the American Newspaper Publishers' Association and the International Mailers' Union shall govern, and either party to this contract shall have the right of appeal to the International Arbitration Board, as outlined in the said Code of Procedure.

(f) Both parties agree that their respective rights and obligations under this contract will have been accorded by the performance and fulfillment of the terms and conditions thereof and that the complete obligation of each to the other is expressed herein. It is understood and agreed that the General Laws of the International Mailers' Union, in effect January 1, 1969, not

in conflict with this contract, shall govern relations between the parties on conditions not specifically enumerated herein.

In accordance with section 13(d)[1] of the contract, on June 19, 1971, sixty-three days before the contract expiration date, the union and the publisher notified each other that they wished to negotiate a new agreement and submitted their respective proposals. Negotiations were commenced, but no agreement was reached by August 21, nor within thirty days thereafter. Neither party, however, made application to submit to arbitration the unresolved issues. Instead, they continued negotiations.

On April 11 and 21, 1972, while negotiations were still continuing, the union requested that certain grievances arising after August 21, 1971, be submitted to arbitration. On April 20 and May 5, the publisher, in response to these requests, informed the union that the collective bargaining agreement signed in 1969 had expired and that the company therefore had no contractual duty to submit the employee grievances to arbitration.

In May 1972, when the protracted negotiations were still unproductive of a new agreement, the union filed an unfair labor practice charge with the National Labor Relations Board and alleged that the publisher was not negotiating in good faith. The Regional Director dismissed the complaint, and the dismissal was affirmed on appeal to the National Labor Relations Board in Washington.

In July or August 1972, the union received from the publisher a new set of contract proposals which it believed represented a "hardening" of the publisher's position and a "final offer." Shortly thereafter, the union determined that negotiations had reached an impasse and requested in writing on August 17, 1972, that the formulation of a new collective bargaining agreement be submitted to arbitration. On September 8, the pub-

lisher responded to the request for arbitration by informing the union that the 1969 contract had expired and that it had no contractual duty to arbitrate. At the same time, however, the publisher stated that it was willing to continue negotiations.

Shortly thereafter, the union filed suit in the district court under section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) to compel the publisher to submit to arbitration both the formulation of a new contract and the resolution of the employee grievances arising after August 21, 1971.

Affidavits were submitted by both the President of Local No. 92 and by the publisher of the Chattanooga News. In his affidavit, the union president stated:

> . . . we have never limited our negotiations to thirty days. We have down through the years, agreed that the terms of a current agreement would remain in full force and effect, no matter how long, as long as we were negotiating new changes. We have always understood that if negotiations become impossible either side under the contract had thirty days in which to notify the other of intentions to submit the questions to arbitration. I do not remember the parties ever negotiating new changes in the contract within thirty days.

Moreover, he stated that union members have always considered themselves bound by the terms of the last signed agreement while the parties were negotiating a new contract.

The publisher did not controvert the averment of the President of Local No. 92 about the effect given by the parties to prior contracts, but insisted, in his affidavit, that both parties had, during their negotiations in 1971 and 1972, "considered that the old contract expired on August 21, 1971, and that all terms and conditions of that contract had become null and void . . . ."

---

1. Section 13(d), *supra*, refers to section 1 as the provision governing proposed amendments and new contracts. This reference is an obvious inadvertence. Section 2 was clearly intended.

Following submission of these affidavits, both parties moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.

The district court, after concluding that there was no genuine issue as to any material fact, denied the publisher's motion for summary judgment, granted the motion made by the union, and ordered the publisher to proceed to arbitration of new contract terms and of employee grievances arising after August 21, 1971.

In its memorandum opinion, although the district court determined that "[i]t is undisputed that the bargaining agreement of August 22, 1969, of the parties expired, and that no new contract or amendment to such 1969 contract was negotiated by the parties within thirty days after such expiration," nevertheless, it rejected the publisher's several contentions that it "lacks jurisdiction to compel arbitration in the instant factual situation; that the 1969 agreement is unenforceable, because it expired prior to the occurrence of the dispute which the union undertakes to arbitrate; that the contract of the parties is void *ab initio* because it purportedly provides for an unlawful closed shop; and that the union is barred from enforcing its agreement due to laches or equitable estoppel."

The district court determined that arbitration was proper because of the decisions in, *inter alia, Winston-Salem Printing Pressmen & A. U. v. Piedmont Publishing Co.,* 263 F.Supp. 952 (M.D.N.C. 1967), *aff'd,* 393 F.2d 221 (4th Cir., 1968); *A. Seltzer & Co. v. Livingston,* 253 F.Supp. 509 (S.D.N.Y.1966), *aff'd,* 361 F.2d 218 (2d Cir. 1966); and *Builders Ass'n of Kansas City v. Greater Kansas Laborers,* 326 F.2d 867 (8th Cir.), *cert. denied,* 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964), cases in which federal courts ordered employers to submit to arbitration terms of new collective bargaining agreements. Such arbitration, the district court stated, is justified by the Supreme Court's endorsement of arbitration as the preferred method of settling grievances arising from existing collective bargaining agreements in the "Steelworkers Trilogy," *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Having determined that arbitration of new contract terms was proper, the district court then examined the scope of its power to resolve arbitration disputes. Quoting from *Warrior & Gulf,* the court stated:

> . . . the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. 363 U.S. at 582–83, 80 S.Ct. at 1353.

In applying this rule, the district court considered the language of section 13(a) of the agreement, which provides:

> To the Joint Standing Committee shall be referred for settlement all disputes arising out of the operation of this agreement . . . and any and all disputes between the parties hereto arising out of their contractual claims.

The district court concluded that the contract provided on its face that both the grievances and the formulation of new contract terms were to be submitted to arbitration.

The district court then considered how its order was to be implemented, since certain parties included on the arbitration panel were not in existence, nor was the Code of Procedure specified in the contract. Section 13(b) of the 1969 contract provided that the chairman of the

board of arbitration should be selected ". . . in any manner unanimously agreed upon by the other four members, [and] if said four members shall fail to select a fifth member . . . said fifth member shall be selected by the President of the International Mailers' Union and the Chairman of the Special Standing Committee of the American Newspapers' Association . . . ." However, the Special Standing Committee no longer existed. Moreover, the agreement provided that the board of arbitration should proceed in its deliberations in accordance with the Code of Procedure created by the International Arbitration Agreement between the International Mailers' Union (IMU) and the American Newspaper Publishers' Association (ANPA). However, this agreement expired in 1967, two years before the publisher and the union signed their 1969 collective bargaining agreement. Accordingly, there was no existing Code of Procedure between ANPA and the International Mailers' Union.

Notwithstanding the publisher's contention that this mutual mistake of fact about the existence of the Standing Committee and the Code of Procedure rendered unenforceable the arbitration provisions of the 1969 agreement, the court nevertheless ordered arbitration because it effectuated the obvious intent of the parties. Accordingly, it ordered the parties to adopt a code of procedure and, if they could not agree, then the arbitration panel was to determine its procedure. It also held that the parties should select a fifth arbitrator in accordance with the United States Arbitration Statute, 9 U.S.C. § 5, which provides in relevant part:

. . . if for any . . . reason there shall be a lapse in the naming of an arbitrator or arbitrators . . . or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators . . . who shall act under the said agreement with the same force and

effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

To this arbitration board would be submitted the publisher's contentions that the agreement is void because it contains a closed shop provision and that the contract should not be enforced because of laches and equitable estoppel. The district court stayed the operation of its judgment during the pendency of this appeal.

The publisher assigns a number of errors for our consideration: (1) that the 1969 agreement contained a closed shop provision rendering it void *ab initio* in its entirety; (2) that a federal court does not have jurisdiction under section 301 to order arbitration of new contract terms; (3) that the disputes are not arbitrable because the contract expired before they arose; (4) that the contract is unenforceable because of mutual mistake or the impossibility of performance because the subject matter of the provision of the contract was not in existence at the time that the parties agreed to it; (5) that the contract is unenforceable because of laches; and (6) that the contract is unenforceable because of equitable estoppel.

■ The first issue we consider is whether the 1969 contract was still operative when the demand for arbitration was made. Unless a valid collective bargaining agreement was in force then, the district court would not have jurisdiction, under § 301, to hear the case.

We believe that the question whether the contract continued in force during negotiations depends on the consequence intended by the parties when they exchanged notices of their desire to amend the contract. The notices did not express an intent to terminate, and this consequence would follow only if other contract provisions are applicable and require it. As we said in *International Union of Operating Engineers, Local No. 181 v. Dahlem Construction Co.,* 193 F.2d

470 (6th Cir. 1951):[2] "A notice to terminate must be clear and explicit. . . . A notice of modification is not a notice of termination and does not affect termination of the contract." 193 F.2d at 475.

Both the language of the contract and the parties' intent, as manifested by past practice, are relevant in determining whether the contract remained operative after August 21, 1971.

> The contract provides in section 13(e): Pending the settlement of any dispute, difference and/or controversy, condition[s] prevailing prior to the change from which the dispute, difference and/or controversy arose shall be preserved unchanged.

Other clauses of the collective bargaining agreement, such as § 13(d), also indicate that work would continue under the existing contract until a new one was negotiated. Both parties agree that past practice has been to continue work under the old agreement. In over ten years of association, the publisher and the union have always assumed that the terms of the existing contract would govern until the new terms were agreed upon. In the present dispute, the mailers reported for their regular shifts and were paid regular wages throughout the course of negotiations.

However, the affidavits of the parties are in direct conflict on the issue of the termination of this contract. Although the union president avers that "[w]e have down through the years, agreed that the terms of a current agreement would remain in full force and effect, no matter how long, as long as we were negotiating new changes"; the publisher insists that both parties had "considered that the old contract expired on August 21, 1971, and that all terms and conditions of that contract had become null

and void . . . ." Such a clear conflict on an issue of material fact cannot be resolved on a motion for summary judgment. In *S. J. Groves & Sons Co. v. Ohio Turnpike Commission,* 315 F.2d 235, 237–38 (6th Cir.), *cert. denied,* 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963), this court stated:

> This Court has on several occasions expressed the view that a trial judge should be slow in disposing of a case of any complexity on a motion for summary judgment, that while such a judgment wisely used is a praiseworthy and timesaving device, yet such prompt dispatch of judicial business is neither the sole nor the primary purpose for which courts have been established, and that a party should not be deprived of an adequate opportunity to fully develop his case by witnesses and a trial, when the issues involved make such procedure the appropriate one. [Citations omitted.]

> It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts, or whether an estoppel or a waiver of certain rights admitted to exist should be drawn from such facts. Under such circumstances the case is not one to be decided by the Trial Judge on a motion for summary judgment. [Citations omitted.]

The case before us presents a sharper controversy than the conflict of inferences that made summary judgment inappropriate in *Groves.* On the record before him, the district judge could not determine whether the contract remained in force after August, 21, 1971 without resolving the conflict presented by the opposing affidavits. This ques-

---

**2.** A recent Sixth Circuit decision which discusses the ramifications of contract termination in the context of vacation pay is *International Association of Machinists v. Oxco Brush Div. of Visitron Corp.,* 517 F.2d 239 (6th Cir. 1975). *See also Nashville Newspaper Printing Pressmen's Union Local 50 v. Newspaper* *Printing Corp.,* 518 F.2d 351 (6th Cir. 1975), where the court observed that "this record discloses that the parties contemplated mutual reopening of the contract but not its termination," in a context closely related to the arbitration of new contract terms contemplated in the case before us.

tion could be answered only after an evidentiary hearing.

The publisher contends also that the contract contains a closed shop provision which renders the agreement void *ab initio.* The provision which states that the employer "agrees to employ in its mailing room members of the Chattanooga Mailers' Union No. 92" would violate § 8(a)(3) of the National Labor Relations Act if it operated to exclude all but union members from employment in the mailing room. Appellees respond, however, that the publisher has consistently employed non-union personnel in the mailing room without objection from the union. The affidavits of the parties are in sharp disagreement on this issue.

■ Nevertheless, we believe that this factual conflict is irrelevant because, even if the disputed clause operated as an illegal closed shop, the illegality of that clause would not invalidate the entire collective bargaining agreement. In *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), the Supreme Court held that the inclusion of a single illegal clause should not invalidate the whole contract where the agreement "shows respect for the law and not defiance of it." 345 U.S. at 78, 73 S.Ct. at 524. Although there was a separability clause in the contract in *Rockaway* and none in the case here, we believe that *Rockaway* stands for the proposition that illegal contract provisions should not render the entire contract void unless the "forbidden provision is so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entirety." 345 U.S. at 78, 73 S.Ct. at 523. The teaching of *Rockaway* has been specifically applied to closed shop provisions in *NLRB v. Southern California Pipe Trades District Council No. 16,* 449 F.2d 668 (9th Cir. 1971) and *Ebinger Baking Co. v. Bakery & Pastry Drivers & Helpers, Teamsters Local 802,* 194 F.Supp. 617 (E.D.N.Y.1961). In the case before us, the putative closed shop provision is not so interwoven with the remainder of the collective bargaining agreement that it requires the entire contract to be invalidated.

■ Appellant also argues that the collective bargaining agreement should not be enforced because of equitable estoppel and laches. Our circuit has held that laches is an equitable defense to be determined by the court rather than a procedural question to be decided by the arbitrator. *Amalgamated Clothing Workers v. Ironall Factories Co.,* 386 F.2d 586 (6th Cir. 1967), *accord, International Union of Operating Engineers Local 150 v. Flair Builders, Inc.,* 440 F.2d 557 (7th Cir. 1971), *contra, Tobacco Workers International Union, Local 317 v. Lorillard Corp.,* 448 F.2d 949 (4th Cir. 1971). Since this issue, like the question whether the agreement continued in force during negotiations, presents a factual dispute, it must also be resolved by conducting an evidentiary hearing.

If the district court determines, after reconciling the conflicting evidence, that the contract did terminate in August 1971, then it lacks jurisdiction to consider the claims concerning the arbitration of grievances arising after termination and the arbitration of new contract terms, called "interest arbitration" or "legislative arbitration" by some commentators.[3]

---

**3.** If the contract has been properly terminated, the forum for the parties is the National Labor Relations Board, where the resolution of the problem will depend in part upon whether or not the disputed issues are considered mandatory or permissive subjects of bargaining. The NLRB has recently decided that neither arbitration of grievances arising after contract termination nor arbitration of new contract terms is a mandatory subject of bargaining. *Hilton-Davis Chemical Co.,* 185 NLRB No. 58, 75 LRRM 1036 (1970); *Columbus Printing Pressmen,* 219 NLRB No. 54, LRRM (1975). This implies that it would be impermissible for either party to insist to the point of impasse upon inclusion of an interest arbitration clause in a new contract, and that one party may make unilateral changes in these areas during the course of negotiations. *See Allied Chemical and Alkalai Workers of America, Local No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

**1314**

Should the court find, on the other hand, that the collective bargaining agreement continued in force during the course of negotiations, it doubtless will direct the parties to arbitrate the employee grievances that arose after the formal expiration of the contract. The more difficult question is whether the district court may compel the parties to engage in interest arbitration.

■ The enforceability of interest arbitration clauses has been a particularly bothersome problem. Early cases, such as *Boston Printing Pressmen's Union v. Potter Press,* 141 F.Supp. 553 (D.Mass. 1956), *aff'd,* 241 F.2d 787 (1st Cir.), *cert. denied,* 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 31 (1957), declined to involve the judiciary in what was thought to be a legislative area. In *Austin Mailers Union No. 136 v. Newspapers, Inc.,* 226 F.Supp. 600 (W.D.Tex.1963), *aff'd,* 329 F.2d 312 (5th Cir. 1964), the court held that it was without jurisdiction to enforce an interest arbitration agreement since the contract had expired.

A number of Supreme Court decisions, however, indicate that the early interest arbitration decisions are not in harmony with evolving national labor policy. In *Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Court recognized the substantive basis of § 301:

> § 301(a) is more than jurisdictional . . . it authorizes federal courts to fashion a body of federal law for the enforcement of . . . collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements. 353 U.S. at 450–51, 77 S.Ct. at 915.

*Lincoln Mills* was not concerned with the issue of interest arbitration, but the Court said,

> . . . [t]he substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. . . . The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. 353 U.S. at 456–57, 77 S.Ct. at 918.

The Supreme Court has unequivocally stated that arbitration is the preferred method of resolving labor-management disputes in the "Steelworkers Trilogy", *supra.* In those cases, the Court emphasized that (1) the role of the court is limited to "ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract," 363 U.S. at 568, 80 S.Ct. at 1346; (2) "[d]oubts should be resolved in favor of coverage," 363 U.S. at 583, 80 S.Ct. at 1353; and (3) a court must enforce an arbitrator's award, even if its interpretation would differ, so long as the award is based on the collective bargaining agreement.

The first case to consider interest arbitration after the "Steelworkers Trilogy," *Winston-Salem Printing Pressmen and Assistants' Union v. Piedmont Publishing Co.,* 393 F.2d 221 (4th Cir. 1968), rejected the reasoning of *Potter Press* and *Austin Mailers.* Appellants in *Winston-Salem* argued that enforcement of an interest arbitration provision would establish a contract of indefinite duration and would deprive employees of the right to terminate the union as their bargaining representative. Rejecting both contentions the court observed that its authority properly encompassed the enforcement of any legal clause which the parties had agreed upon in their contract:

> Nothing would be more out of step with our national labor policies than for courts to refuse to enforce a voluntary agreement to arbitrate differences.

A provision to arbitrate when agreement upon a new contract proves impossible, as is the case here, is part of an existing agreement and refusal to comply therewith constitutes a breach. This court is not asked to determine the provisions of a new contract or to perform any nonjudicial function. The drawing of the new contract will be in the hands of an arbitrator where the parties chose to place the authority and responsibility. The court is asked to do no more than enforce a provision of an existing contract, a traditional judicial function. 393 F.2d at 227.

See also Aikens v. Abel, 373 F.Supp. 425 (W.D.Pa.1974) and Columbus Printing Pressmen, 219 NLRB No. 54 (dissenting opinion).[4]

We agree with the reasoning of Piedmont and Aikens. The enforcement of an interest arbitration clause is within the scope and purpose of our national labor policy, and the parties here clearly contemplated the arbitration of new contract terms. If the district court finds that the collective bargaining agreement remained in effect during negotiations, then the provision for the arbitration of new contract terms must be enforced.

■ Nor would arbitration be barred because the procedure established by the parties is no longer workable. Even though the arbitration procedures of the ANPA and the IMU are no longer in existence, the obvious intent of the parties was to arbitrate their differences, and that intent should not be frustrated. The district court was correct in looking to the United States Arbitration Act to provide a method for choosing a disinterested arbitrator. Other circuits have recognized the applicability of the United States Arbitration Act in suits upon collective bargaining agreements. International Ass'n of Machinists & Aerospace Workers v. General Electric Co., 406 F.2d 1046 (2d Cir. 1969); Newark Stereotypers' Union v. Newark Morning Ledger Co., 397 F.2d 594, 596 n. 2 (3d Cir.), cert. denied, 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1968), Pietro Scalzitti Co. v. IUOE Local 150, 351 F.2d 576, 579–80 (7th Cir. 1965). And the district court also correctly held that the arbitrator may determine his procedures if the parties cannot agree.

■ Appellants contend, however, that the interest arbitration clause expired thirty days after the expiration date of the original contract; appellees assert that the thirty-day provision merely concerns a notice requirement and is not a bar to arbitration. The resolution of this conflict concerns interpretation of specific language in the arbitration clause.

4. In Aikens v. Abel, 373 F.Supp. 425 (W.D.Pa. 1974), a federal district court rejected the notion that a union had breached its duty of fair representation by giving up the right to strike in return for an interest arbitration clause. The court observed:

The emotion-laden term, right to strike, inevitably recalls the bloody and bitter historical struggle for parity that was waged by union members against the steel companies. No one, and especially no one with roots in the Pittsburgh area, belittles the importance of the right to strike; brave men died to win it. No one discounts their sacrifice. But it is symbolic of the changes wrought by time that this dispute is being resolved by means of civilized debate in a court of law, rather than by recourse to the violence and recrimination which characterized labor relations in the recent past. 373 F.Supp. at 437.

And in her dissenting opinion in Columbus Printing Pressmen, 219 NLRB No. 54, NLRB Chairman Betty Murphy argued that interest arbitration should be a mandatory subject of bargaining. She emphasized that public policy favors the voluntary resolution of disputes and the elimination of economic warfare which interferes with the free flow of commerce. Moreover, interest arbitration appears to be within the scope of section 201 of the LMRA, since Title II of the Act "is far more concerned with disputes over contractual terms and conditions of employment than grievance matters . . . ."

Chairman Murphy concluded that interest arbitration is squarely in line with national labor policy and that "[i]ts provision for the continuing effectiveness of established contract terms throughout the negotiation period for renewal thereof and the assurance of continued employment to workers and uninterrupted production to the employer are the very essence of the bargaining relationship and the protection of employer-employee interests." 219 NLRB No. 54 at 26.

Whether the parties met the procedural requirements for arbitration is a question which must be left to the arbitrator. Faced with a similar situation in *Piedmont,* Judge Sobeloff observed:

This court intimates neither agreement nor disagreement with the trial judge's construction of Section 15 of the original contract, for in our view this particular issue involves an interpretation of the contract which should be determined independently by the arbitrator. . . . [W]ho is better qualified to determine the intent of the parties than an arbitrator chosen because of his knowledge of the customs and practices of the industry? 393 F.2d at 228.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. Costs to appellants.