Thomas C. STE. MARIE,
Plaintiff–Relator,

v.

CITY OF DAYTON, Defendant–
Respondent.

No. C–3–99–513.

United States District Court,
S.D. Ohio,
Western Division.

Oct. 7, 2002.

Dwight Dean Brannon, Dayton, OH, for plaintiff.

John J. Danish, Julia LaRita McNeil, Brent Lyle McKenzie, Stacey D. James, Wright & VanNoy, Dayton, OH, for defendant.

DECISION AND ENTRY SUSTAINING DEFENDANT'S RENEWED AND UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DOC. # 47, RENEWING DOC. # 19); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff Thomas C. Ste. Marie ("Plaintiff"), pursuant to 42 U.S.C. § 1983,

brought the underlying suit against Defendant City of Dayton ("City"), alleging that the City discharged him without due process. In a March 21, 2001, Decision and Entry (Doc. # 27), the Court overruled cross Motions for Summary Judgment filed by Plaintiff (Doc. # 18) and Defendant (Doc. # 19), finding that a genuine issue of material fact existed as to whether Plaintiff was on probationary status at the time of his discharge. A finding in the affirmative would have defeated his due process claim. The Court rendered its decision without prejudice to either party renewing its respective Motion, provided it could adduce additional evidence satisfactorily disposing of the genuine issue. This the City attempted to do, filing its Motion for Renewal of Its Prior Motion for Summary Judgment (Doc. # 31)("First Motion for Renewal") on May 10, 2001. However, the Court overruled this Motion, and sustained Plaintiff's Motion to Strike Affidavits (Doc. # 34), in a August 13, 2001, Decision and Entry (Doc. # 46), finding that the affidavits on which the City relied were deficient. Again, the Court's ruling was without prejudice to renewal, were the City to correct the noted deficiencies.

On September 4, 2001, the City filed the instant Motion for Renewal of Its Prior Motion for Summary Judgment (Doc. # 47)("Second Motion for Renewal"), attaching revitalized versions of the affidavits previously found to be defective. In a September 26, 2001, Notation Order, the Court granted Plaintiff's Motion for Extension of Time to Respond (Doc. # 48), extending Plaintiff's opportunity to respond to the City's Second Motion for Renewal to October 16, 2001. To date, almost one year later, the Plaintiff has not responded. Herein, the Court addresses the City's Second Motion for Renewal, which it shall sustain.

## I. *Factual Background*

The Court set forth the background facts of this case in its March 21, 2001, Decision and Entry, and will only summarize them here.[1] On March 30, 1999, a few days shy of nine months on the job, Plaintiff was discharged from his position as officer with the Dayton Police Department ("DPD"). The crucial question in this case is whether Plaintiff was on probationary status at the time of his discharge. The 1995 collective bargaining agreement ("CBA") between the City and the Fraternal Order of Police ("F.O.P."), Plaintiff's union, created a nine-month probationary period. The City Charter, by contrast, creates a six-month probationary period. Under either, a probationary employee may be discharged without cause; conversely, an employee who has moved beyond probationary status may only be discharged for cause, with all the attributes of due process attaching. In an earlier Decision and Entry, overruling Defendant's Motion to Dismiss (Doc. # 5), the Court found that nothing prevented the City and the F.O.P. from displacing the six-month probation provision in the City Charter with the nine-month provision of the CBA. (Doc. # 17 at 17.) The question is whether the 1995 CBA was in effect at the time Plaintiff was discharged.

Article 32 of the 1995 CBA stated that the agreement was to remain in effect through May 17, 1998, "and shall continue thereafter for successive periods of twelve (12) months, unless either party to this Agreement, on or before sixty (60) days prior to the expiration of such period, notifies the other party in writing of its inten-

---

1. For purposes of ruling on the Defendant's Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiff, who is the nonmoving party.

tion to terminate this Agreement." (Doc. #47 at Ex. A, at 63.) On March 5, 1998, the F.O.P., invoking Article 32, sent notice to the City "of its intent to negotiate modifications to the existing [CBA] and to negotiate [a successor agreement]." (Doc. #47 at Ex. C.) Whether the 1995 CBA controlled the terms of Plaintiff's probation at the time of his discharge depends upon whether the F.O.P. intended to terminate the 1995 CBA at the expiration of the contractual term, or intended it to remain in effect while the two sides negotiated "modifications" thereto.[2] If the F.O.P. intended to let the 1995 CBA expire while it negotiated a new CBA, then, presumably, the City Charter, with its six-month probationary period, controlled in the interim, and thus at the time of Plaintiff's discharge.

The City has proffered the affidavits of Maurice Evans, a Human Resource Analyst for the City of Dayton, who served as the City's scribe to the 1999 CBA negotiations, and Thomas A. Bennett, a DPD detective, and the President of, and a negotiator for, the local Lodge of the F.O.P., at the time of the 1999 CBA negotiations. Both men, representing the City and the F.O.P., respectively, state that, in negotiating the modification of the 1995 CBA, which gave rise to the 1999 CBA, it was not the intent of either party to terminate the 1995 CBA. They assert that the 1999 CBA, with its retroactive effective date of May 18, 1998, did not create a "new" CBA; it merely modified the CBA then in existence, i.e., the 1995 CBA. The retroactivity of the 1999 CBA agreement, Bennett states, was adopted to give the DPD employees covered by the CBA the benefit of newly negotiated pay increases.

In its August 13, 2001, Decision and Entry, the Court noted that Evans had not demonstrated how he had personal knowledge of the 1999 CBA negotiations, or how he could have known that neither the City nor the F.O.P. ever expressed an intent to terminate the 1995 CBA. (Doc. #46 at 10.) It noted similar deficiencies with Bennett's affidavit. (*Id.*) Accordingly, the Court found that both affidavits were deficient under Fed. R. Civ. 56(e), in that neither individual had shown affirmatively that he was competent to testify to the matters stated therein. (*Id.*)

Plaintiff has not responded to the City's Second Motion to Renew. As an additional matter, there is no indication in the Court's official docket record for this case that he has attempted to depose Evans or Bennett.

## II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions

---

**2.** In early 1999, the City and the F.O.P. "modified" the CBA and agreed that the changes would be retroactive to May 18, 1998. Plaintiff argued that if the 1995 CBA actually expired on May 17, 1998, per the F.O.P.'s termination notice, then the six-month probation provision of the City Charter became effective, and the City and the F.O.P. could not contract away his tenured status by retroactive application of the 1999 CBA. The City has maintained its focus on the non-termination of the 1995 CBA, and has not addressed this latter issue.

on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839,

108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis*

The disposition of this case comes down to whether the 1999 CBA should be construed as a wholly new CBA, created to fill the void left by the termination of the 1995 CBA at the end of its contractual term, on May 17, 1998, as Plaintiff contends, thus making him a probationary employee for only a six-month period of time, pursuant to the City Charter, or as a modified version of the 1995 CBA, which remained operative during the 1999 CBA negotiations, thus subjecting Plaintiff to a nine-month probationary period, as the City contends. The answer to that question depends on what the F.O.P. and City intended at the time the topic of modification was broached. "[W]hether the contract continued in force during negotiations depends on the consequence intended by the parties when they exchanged notices of their desire to amend the contract." *Chattanooga Mailers' Union, Local No. 92 v. Chattanooga News Free Press*, 524 F.2d 1305, 1311 (6th Cir.1975), *overruling on other grounds recognized by Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 404 (6th Cir.1988).

■ In their re-submitted form, the affidavits of Evans and Bennett adequately demonstrate that each is competent to testify to the matters stated therein. As to Evans, he states in his affidavit that he was a member of the City's contract negotiations team during the negotiations leading to the 1999 CBA. (Evans Aff. ¶ 6.) He further states that it was his position as the record keeper for the negotiations team to keep the official notes of the team's meetings, as well as those of the actual bargaining sessions. (*Id.* ¶ 9.) He is also responsible for the records of all correspondence between the City and the F.O.P. pertaining to the 1999 CBA negotiations, which he presently maintains in his possession. (*Id.*) Given these uncontested assertions of fact, the Court finds that Evans is competent to testify that the City never intended to terminate the 1995 CBA.

■ As to Bennett, he states that he was the principal F.O.P. representative in the 1999 CBA negotiations, and that he did, in fact, participate in said negotiations. (Bennett Aff. ¶¶ 5, 6.) He also states that he was the co-chairman of the F.O.P.'s negotiations team, and that, as a general practice, the F.O.P. assumes that a pre-existing CBA remains effective while it negotiates proposed modifications. (*Id.* ¶ 10.) He further states that it has been the continuing policy of the F.O.P., at least in recent times, to notify the City of its intent to modify existing CBAs in the manner employed in this instance. (*Id.* ¶ 8.) Accordingly, the Court finds that Bennett, too, is competent to testify that the F.O.P. never intended to terminate the 1995 CBA.

■ As for the representations made by Evans and Bennett, the Court has discussed them in previous rulings. (*See* Doc. # 27 at 13; Doc. # 46 at 9–11.) Essentially, they support the finding that neither the City nor the F.O.P. intended to terminate the 1995 CBA, and that the March 5, 1998, notice from the F.O.P. to

the City was merely a perfunctory notification by the F.O.P. that it wished to modify, or amend, the existing CBA. Given the mutual agreement of the negotiating parties on this issue, the Court noted in its most recent Decision and Entry in this case that "the Plaintiff will have a difficult time proving" that they intended otherwise. (Doc.# 46 at 10.)

> Indeed, in order to find that the 1995 CBA did terminate on May 17, 1998, a trier of fact would have to discredit the testimony of Bennett and Evans, who are representatives of the parties to the 1995 CBA. Such a finding would, most probably, be against the manifest weight of the evidence.

(*Id.* at 10–11.) In so stating, the Court suggested, without actually deciding, that summary judgment "may be" warranted on the strength the Evans and Bennett affidavits. (*Id.* at 10.) In reality, it is the affidavit of Bennett that is key. Article 32 of the 1995 CBA did not require a mutual agreement to terminate; it required merely the written notification of a single party's intention to do so. As it is the F.O.P.'s March 5, 1998, notice which lies at the heart of the matter, it is Bennett, as the F.O.P. President and co-chairman of its negotiations team, whose state of mind on March 5, 1998, and in the subsequent negotiations, matters most. Of course, Evans' statement that the City proceeded in its negotiations leading to the 1999 CBA under the belief that the 1995 incarnation was still in effect is also strong, probative evidence that the F.O.P.'s March 5, 1998, notice should not be read as a termination notification.

In its Motion to Strike Affidavits (Doc. # 34), which the Court sustained for rea-sons stated above (*see* Doc. # 46), Plaintiff argued that Evans' and Bennetts' statements that the City and the F.O.P. did not intend for the 1995 CBA to terminate the 1995 CBA are at odds with the fact that, linguistically speaking, the agreement provided that termination was the only way by which a party could relieve itself of its obligations thereunder. That is, Article 32 states that the CBA will renew automatically unless either party notifies the other of its intention to *terminate* the Agreement. Neither Article 32 nor any other provision expressly provides for the right to *modify* the 1995 CBA. This is in contrast to Article I, § 4, of the 1999 CBA, which does address a method for accomplishing as much, and the agreement at issue in *Chattanooga Mailers,* which provided for the same. 524 F.2d at 1306.

Given that the Court did not address this argument in its previous Decision and Entry, it will do so now. If, upon receiving the F.O.P.'s notice of intent to "modify" the 1995 CBA, the City had rejected the request by invoking the argument now raised by Plaintiff, to wit, that modification was not an option for which the agreement provided, then that certainly would have placed the F.O.P. in a contractual hard place, for the Court acknowledges that a good argument exists that the 1995 CBA provided only one way out unilaterally: termination. Faced with this argument, the F.O.P. would have been hard pressed to avoid the parol evidence rule, which likely would have barred any evidence tending to show that it had been intended that a provision not expressly included in the 1995 CBA, i.e., one allowing a party to institute modification negotiations, nevertheless be included.[3] Thus, had the City

---

**3.** The parol evidence rule provides that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini,* 90 Ohio St.3d 22, 734 N.E.2d 782, 789 (2000).

refused to negotiate modifications to the 1995 CBA, the F.O.P. likely would have had to provide written notice of its intent to terminate that agreement, and then approached the City again with a blank slate, or simply tolerate the agreement for another year.[4]

Of course, as it happened, rejection was not the City's response to the F.O.P.'s notice; acceptance was. This fact is important. It is settled in Ohio that parties to a contract may modify such by mutual assent thereto. *See Murrell v. Elder–Beerman Stores Corp.*, 16 Ohio Misc. 1, 239 N.E.2d 248, 255 (1968); *Citizens Fed. Bank F.S.B. v. Brickler*, 114 Ohio App.3d 401, 683 N.E.2d 358, 362 (1996); *Nagle Heating & Air Conditioning Co. v. Heskett*, 66 Ohio App.3d 547, 585 N.E.2d 866, 868 (1990). As such, it would matter not if the 1995 CBA were read as exclusive of a right-to-modify provision. While one side might not have been able to unilaterally demand modification negotiations thereunder, as long as both parties mutually agreed to do so, it is not for a court to tell them that they were not allowed. Certainly, the two signatories could have been more clear up front, and they must have recognized this fact, given that the 1999 CBA expresses a policy on modifications. However, what the 1995 CBA might have lacked in its text, the law supplies on its own.[5]

For the reasons just stated, the "right" to modify the 1995 CBA is not the relevant question. The relevant question is the intent of the parties, particularly that of the F.O.P. at the time it sent its March 5, 1998, notice to the City. Article 32, to which both the City and the F.O.P. were bound, required written notification of a party's *intent* to *terminate*, lest the agreement renew automatically on May 18, 1998.

In its March 21, 2001, Decision and Entry, the Court, assuming *arguendo* the conclusions set forth in the deficient affidavits of Evans and Bennett, and construing the facts in a light most favorable to Plaintiff, noted five factors, based on the language of the F.O.P.'s notice of March 5, 1998, giving rise to a genuine issue of material fact that the City and the F.O.P. intended to let the 1995 CBA lapse on May 17, 1998. (Doc. #27 at 11–12.) *First*, there was the invocation of Article 32 in the F.O.P.'s notice; superfluous, if all it intended was to negotiate modifications. After all, the default if the signatories were silent was that the CBA would extend for an additional twelve months.[6] Article 32 said nothing about providing notice if a party sought only to negotiate modifications. *Second*, there is the fact that the F.O.P.'s notice was sent prior to sixty days before the May 17, 1998, expiration date, a fact from which the inference can be drawn that it was proceeding in compli-

---

**4.** In any event, absent a written expression on the part of the F.O.P. that it intended to terminate the agreement, it could have expressed any sentiment whatsoever; the CBA still would have renewed itself.

**5.** As noted above, Article 5, § 3, of the 1995 CBA contemplates a negotiation period within the 90–day period prior to the expiration date stated in Article 32, which may or may not refer only to negotiations triggered by an intent-to-terminate notice. At best, the 1995 CBA is ambiguous on this question.

**6.** Ohio Rev.Code § 4117.09(E) states that "parties may extend any agreement, but the

extensions do not affect the expiration date of the original agreement," which must be no later than three years from the date of execution. In other words, where parties do nothing, and thus tacitly agree to an extension of the existing CBA, it is proper to characterize the extended CBA as a new agreement carrying forward all of the previous terms and conditions. Legally speaking, the previous CBA automatically expires at the same time that all of its terms and conditions renew in the guise of a new CBA. This characterization does not alter the Court's analysis.

ance with Article 32. Again, this was a superfluous gesture, if the F.O.P. did not intend to invoke Article 32 for its right to *terminate* the 1995 CBA. *Third*, there was its expressed desire to negotiate "successor agreements," implying that it no longer wished to be governed by the existing agreement. *Fourth*, there was time-is-of-the-essence language in the F.O.P.'s notice:

> The Lodge is interested in commencing the negotiations at the earliest possible date so that the parties will be afforded the fullest opportunity to reach well-reasoned and fair settlements.

(Doc. # 47 at Ex. C, ¶ 4.) The Court remarked that this sentiment, too, was superfluous, if the F.O.P. did not anticipate that the existing agreement would be terminated. *Fifth*, and finally, there is the fact that the 1999 CBA was made retroactive to May 18, 1998. Had provisions of the 1995 CBA carried forward, the Court observed, a retroactive application of the "modified" CBA would have been unnecessary.

The Court finds that the above inferences favorable to Plaintiff *are no longer reasonable* in light of the statements made by Evans and Bennett in their *uncontradicted* affidavits.[7] These affidavits place the question beyond reach, in favor of the City.

The facts of this case are similar to those presented in the *Chattanooga Mailers* case. Therein, the two parties to a collective bargaining agreement each expressed a desire to negotiate a new agreement within the proper time frame. 524 F.2d at 1309.[8] Neither party expressed in

---

7. Although the Court does not consider them herein for purposes of ruling on summary judgment, it does note that the competing inferences favoring Plaintiff are further weakened by other facts adduced by the City. For example, the 1999 CBA included wage increases, and that the retroactivity of the new agreement, irrelevant to the issue of probationary status (which remained unchanged), was adopted to give police officers the full benefit of those increases. (Bennett Aff. ¶ 16.) The logic of that can hardly be doubted. The significance of the language suggesting that time was of the essence is susceptible to the same undermining, given that any group desirous of more generous benefits would naturally want to begin the negotiating process as soon as possible. Probably of even greater importance is the observation that had the F.O.P. not requested negotiations sufficiently in advance of the expiration/renewal date of May 17, 1998, affording ample time for the City's response prior to the close of the right-to-terminate window, it would have lost its right to *then* notify the City of its intent to terminate in the event the City declined the invitation to negotiate modifications, or failed to respond altogether. Thus, it would have been bound by the terms of the 1995 CBA for another year. The 60–day cut-off in 1998 would have been March 18. Thus, the F.O.P. had that reason to include time-is-of-essence language in its March 5 notice. While the City might have agreed to negotiate modifications had the F.O.P. requested as much after the right-to-terminate window had closed, the very fact that the F.O.P. would have been without its right to terminate the 1995 CBA for another year would have severely limited its bargaining leverage. By the same token, the reference to Article 32 might be seen not as an invocation of the right to terminate so much as a reference to the fact that the expiration date, designated therein, was nigh and the season for re-negotiations ripe. This is consistent with Article 5, § 2, of the 1995 CBA, which afforded time off to the F.O.P. negotiations team "during the last ninety (90) days of this Agreement prior to the termination date specified in under [sic] Duration [i.e., Article 32]."

8. As noted above, one difference between the expiration/renewal provision in *Chattanooga Mailers* and that at issue herein is that in the former, the agreement expressly provided for the right to propose amendments. Nevertheless, for the reasons already stated, this distinction is not significant, given that mutually assenting parties may always agree to modifications. The relevant question, in both cases, is whether the parties who initiated the modification negotiations intended to let the existing agreement lapse.

writing an intent to terminate the agreement then in existence. Although they entered into negotiations prior to the expiration date of the existing agreement, they did not reach a new accord until after such date had passed. *Id.* The issue presented was the same as that herein: upon the end of the contractual term, did the existing agreement expire, or did it automatically renew? The Court stated:

As we said in *International Union of Operating Engineers, Local No. 181 v. Dahlem Construction Co.*, 193 F.2d 470 (6th Cir.1951): "A notice to terminate must be clear and explicit.... A notice of modification is not a notice of termination and does not affect termination of the contract." 193 F.2d at 475.

\*    \*    \*    \*    \*    \*

Both the language of the contract and the parties' intent, as manifested by past practice, are relevant in determining whether the contract remained operative after [the expiration date].

524 F.2d at 1311–12. Of course, the significant factual difference between *Chattanooga Mailers* and the case at bar is that in the former, the negotiating parties disagreed as to what their intent had been with respect to the status of the existing agreement. Because the employer stated in its affidavit that the parties had intended for the existing agreement to expire while they negotiated a new one, while the union insisted in its own affidavit that the opposite was true, summary judgment was not proper, as the material fact of the case was disputed. *Id.* at 1312.

The concern of the *Chattanooga Mailers* court is allayed in this case. If the F.O.P. disagreed with the City in this instance, e.g., if Bennett's affidavit contradicted that of Evans, the former contending that the F.O.P. intended to terminate, the latter contending that the City understood otherwise, then this case would be on all fours with *Chattanooga Mailers* and the ques-

tion would be for the jury. Obviously the facts are different. The negotiating parties do not disagree on what each intended. It is, rather, a potential beneficiary of the CBA, who was not a party to the 1999 CBA negotiations, or privy to the "mindset" of the F.O.P. at the time it drafted its letter of March 5, 1998, who argues that the negotiating parties did not intend at the time that which they now claim they intended. As *Chattanooga Mailers* makes plain, however, it is the intentions of the two bargaining parties that are material. The F.O.P.'s March 5, 1998, notice is, of course, of paramount importance to the question of intent, but the Court may also turn to the *past practice* of the negotiating parties for interpretive assistance. In this case, for the jury to find it reasonable that the F.O.P. intended to terminate the 1995 CBA, it would have to dismiss the following evidence:

1. The fact that the 1995 CBA required written notification of a party's intent to "terminate" the agreement, and that no party herein, the F.O.P. in particular, expressly gave such notification.

2. The fact that the F.O.P.'s March 5, 1998, notice expressly stated that the intent of the F.O.P. was to negotiate "modifications."

3. Bennett's statement, made as President of the F.O.P., and as the co-chairman of its negotiations committee, that it was the established course of conduct of the F.O.P. to notify the City in advance of its intent to negotiate modifications. (Bennett Aff. ¶ 8.)

4. Bennett's statement, made as President of the F.O.P., and as the co-chairman of its negotiations committee, that the F.O.P. did *not* intend to terminate the 1995 CBA. (*Id.* ¶¶ 10, 17.)

5. Bennett's statement, made as President of the F.O.P., and as the co-chairman

of its negotiations committee, that it has been the F.O.P.'s position during negotiations of new terms that pre-existing CBAs remain in effect. (*Id.* ¶ 10.)

6. Bennett's statement, made as President of the F.O.P., and as the co-chairman of its negotiations committee, that during the negotiations, subsequent to May 17, 1998, the City and the F.O.P. continued to process grievances pursuant to the 1995 CBA. (*Id.* ¶ 12.)

7. Bennett's statement, made as President of the F.O.P., and as the co-chairman of its negotiations committee, that the City and the F.O.P. only negotiated modifications to certain provisions of the 1995 CBA, and did not adopt an entirely new agreement. (*Id.* ¶ 13.)

8. Evans' statement, based on his involvement with the City's bargaining team as an analyst, its scribe, and its official record-keeper, that the City proceeded in the negotiation process under the impression that the 1995 CBA remained in effect (Evans Aff. ¶ 10(D)), which is evidence not only of the City's intent, but of what the F.O.P. intended in writing its March 5, 1998, notice. (In other words, the recipient's understanding of the sender's notice is indicative of the sender's manifested intent.)

Obviously, the credibility of Evans and Bennett cannot be judged on paper arguments. The Court might further recognize Wigmore's hallowed commentary that cross-examination is "the greatest legal engine ever invented for the discovery of truth." Yet, to get to trial, Plaintiff cannot remain silent and hope that the Court, on its own, will intuit some reason to question the credibility of potential witnesses who have submitted affidavits at summary judgment on the material issues. Herein, Plaintiff has presented no argument for why the opinions of Evans and Bennett, competently submitted, should be doubted. Indeed, there is no indication that Plaintiff

has taken their depositions in an attempt to uncover inconsistencies. Granted, it is difficult to get a party to say "yes, we did intend to terminate," if it is in that party's interest to maintain that it did not, but discovery might have yielded other evidence favorable to Plaintiff. For example, he might have been able to draw into question Bennett's statement that it has consistently been the policy of the F.O.P. to request modification negotiations in the manner it did with its March 5, 1998, notice. He might have been able to draw into question whether grievances filed after May 17, 1998, but before the 1999 CBA went into effect, actually were handled pursuant to the 1995 CBA, as Bennett maintains. Similarly, he might have drawn into question whether the City and the F.O.P., in prior dealings, truly have treated pre-existing CBAs as operative during subsequent negotiating sessions that take place after the expiration date. As far as the Court can tell, Plaintiff did not attempt to do any of this.

The Court can only assume, therefore, that the opinions of Evans and Bennett are credible, undermined only by the inference which arises on account of the F.O.P.'s invocation of Article 32 in its March 5, 1998, notice. While the fact remains that the reference to Article 32 was likely irrelevant for the purpose of requesting modifications, at this point, the evidentiary value of that fact has been reduced to a scintilla, which is not enough to withstand summary judgment. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Babin,* 18 F.3d at 341.

Herein, a jury simply could not hear the evidence noted above, and still *reasonably* find that the preponderance of the evidence favors a judgment in favor of Plain-

tiff. The critical fact, that of intent, has been addressed by the City in uncontested affidavits, submitted by representatives of the only two parties to the 1999 CBA negotiations. Plaintiff cannot remain silent and expect that the Court will not find this evidence both credible and dispositive.

These affidavits sufficiently establish the critical facts which we have summarized above. OCF may not, as it seems to suggest, " 'merely recite the incantation, "Credibility," and have a trial on the hope that a jury may disbelieve factually uncontested proof.' " *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir.1989) (quoting *Curl v. I.B.M. Corp.*, 517 F.2d 212, 214 (5th Cir.1975)). Rule 56 clearly requires more than that. If OCF truly believes that these affiants' testimony is not credible, then it was incumbent upon OCF to depose them (or otherwise explore their testimony) during discovery and attempt to expose any inconsistencies in their testimony which could potentially cast doubt on their affidavits. OCF failed to do so and, perhaps as a consequence, these affidavits are now uncontradicted on the record before us.

*Jones v. Owens–Corning Fiberglas Corp.*, 69 F.3d 712, 718 (4th Cir.1995)(footnote omitted). This Court finds the sentiments expressed by the Fifth Circuit in *Jones* appealing in the present case.

Had Plaintiff offered an opposing memorandum and argument, as it had requested an extension to do on September 26, 2001, then so long as his argument had posed a credible factual basis on which the credibility of Evans and Bennett could have been called into question, this Court would have concluded that a genuine issue of material fact existed, and a jury trial would have been his. He did not do this. Given that the Court has no inherent reason to question the credibility of Bennett and Evans, their statements as to each of the negotiating parties' understanding of the status of the 1995 CBA, after May 17, 1998, and during the 1999 CBA negotiations, is conclusive. As such, were the entirety of the record as it now stands presented to a jury at trial, the Court would be required to grant judgment as a matter of law in favor of the City. That being the case, summary judgment is appropriate. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1465, n. 5 (6th Cir.1984); *Aetna v. Loveland Gas & Elec.*, 12 Ohio Misc. 230, 369 F.2d 648, 653 (6th Cir.1966).

## IV. *Conclusion*

For the reasons stated herein, the Court finds that there is no genuine issue of material fact that the F.O.P. contacted the City by letter dated March 5, 1998, with the intent to negotiate modifications to the CBA, that the City agreed to such negotiations, that the F.O.P. did not intend to terminate the 1995 CBA while it negotiated modifications thereto, that the City and the F.O.P. both clearly intended for the 1995 CBA to renew automatically upon its expiration date of May 17, 1998, while they negotiated said modifications, and that the nine-month probationary period contained in the 1995 CBA remained in effect for Plaintiff at the time of his discharge. Accordingly, the City is entitled to judgment as a matter of law. Its Second Renewed Motion for Summary Judgment (Doc. # 47, renewing Doc. # 19) is well taken, and is hereby SUSTAINED.

Judgment in this matter is to enter in favor of Defendant, City of Dayton, and against Plaintiff, Thomas C. Ste. Marie.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the South-

ern District of Ohio, Western Division, at Dayton.